IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

CORRAINE JAMES and WARD JAMES,     *

     Plaintiffs,     *

vs.     *

                                       CASE NO. 4:09-CV-147 (CDL)

LITTON LOAN SERVICING, L.P.,     *

     Defendant.     *

_____

O R D E R

Plaintiffs Corraine and Ward James allege that their mortgage loan servicer, Defendant Litton Loan Servicing, L.P. ("Litton"), violated the Real Estate Settlement and Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617. Plaintiffs also assert claims against Litton for breach of contract, fraud, conversion, and negligence. Presently pending before the Court is Litton's Motion for Summary Judgment (ECF No. 12). For the reasons set forth below, Litton's motion is denied as to the RESPA, fraud, conversion, and negligence claims. Litton's motion is granted as to Plaintiffs' breach of contract claim.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the

light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiffs, the record reveals the following.

## I.   **Plaintiffs' Loan**

Plaintiffs obtained a loan from NationsCredit Financial Services Corporation ("NationsCredit") on June 19, 1997. Def.'s Mot. For Summ. J. Attach. 2, Spradling Aff. [hereinafter Spradling Aff.] Ex. A, Promissory Note, June 19, 1997, ECF No. 12-3 [hereinafter Note]. The loan was secured by Plaintiffs' home. Spradling Aff. Ex. B, Security Deed, June 19, 1997, ECF No 12-4. The loan amount was $40,046.37, the interest rate was 14.6390% per year, and the loan term was 144 months. Note at 1. According to the Note, the payment amount was $591.80; the first payment was due on July 24, 1997, and subsequent payments were due on the twenty-fourth of each month. *Id.* The payment due date was later changed to the first of each month. James Aff. Ex. 6, Letter from Pls. to Litton, Aug. 25, 2009 [hereinafter Aug. 25 Request] Attach. 2, Detail Transaction History

[hereinafter Txn. History], ECF No. 16-7 at 24 of 49. Under the Note, payments were to be applied "first to insurance premiums, next to late charges (if any), next to interest accrued through actual payment date, next to principal to the extent necessary to bring the account up to date, next to add-on insurance, next to returned check charges, and then to additional principal." Note at 1. The Note also provides: "While there is no separate charge if payments are made after the scheduled due date, late payments will cause an increase in the amount of interest incurred because interest is calculated on the unpaid principal amount of loan." *Id.*

## II. Plaintiffs' Payments to Litton

Litton became the servicer of Plaintiffs' loan in January 2000. Spradling Aff. ¶ 9. According to Litton's records, Plaintiffs made many of their payments after the payment due date. *E.g.*, Txn. History at 17 of 49 (reflecting payments posted during the middle of the month when payments were due on the first of the month); *id.* at 24 of 49 (reflecting payment posted on 7/31/1997 when payment was due on 7/24/1997). The amount of interest Plaintiffs were required to pay with each payment was based on the unpaid principal amount of the loan. Spradling Aff. ¶ 12. Therefore, if Plaintiffs made a payment after the scheduled due date and they did not increase their payment to cover the interest accrued through the payment date, their payment would not be enough to cover the principal, interest, and extra

interest due. Under the terms of the Note, payments were to be applied to "interest accrued through actual payment date" and then to principal, Note at 1, so the amount Litton was required to apply to principal could be decreased by the amount of extra interest that had accrued by the time Plaintiffs made their late payment.

Plaintiffs believe that Litton held their payments and applied them "a long period of time" after Plaintiffs mailed the payment so that Litton could charge Plaintiffs extra interest and late fees. James Aff. ¶¶ 6, 10, ECF No. 16-1. In support of this theory, Plaintiffs point to evidence that they disputed late charges via Litton's customer service line and repeatedly told Litton that they mailed their payment "on the 3rd of every month." Spradling Aff. Ex. D, Composite Report, Mar. 15, 2010 [hereinafter 2010 Composite Report], ECF No. 12-6 at 13, 3/1/2006 entry; *accord id.* at 15, 7/8/2005 entry. Litton's representative stated in his affidavit that Litton "applied Payments' [sic] to [Plaintiffs'] loan account in the manner agreed upon and set forth in the Note." Spradling Aff. ¶ 11. Litton, however, pointed to no evidence regarding how it determined when Plaintiffs' payments were "made," such as how Litton processed and posted Plaintiffs' payments. Therefore, based on the present record, which consists of the unrebutted statement that Plaintiffs sent their payment on the third of every month and the undisputed evidence that payments were sometimes not posted to Plaintiffs'

account until the middle of the month, there is a fact dispute regarding whether Litton delayed in applying Plaintiffs' payments. There is likely a simple explanation for the alleged delay, but Litton did not provide the Court with any evidence on this point, and the Court may not speculate that Litton routinely processed and posted payments as soon as Litton received the payments in the mail.

**III. Late Fees**

Although the Note provides that "there is no separate charge if payments are made after the scheduled due date," Note at 1, Litton charged Plaintiffs late fees on many occasions. Litton pointed the Court to evidence that it assessed Plaintiffs late fees on seven occasions during 2002 and 2003 but that it waived all of those late fees in June of 2003. Spradling Aff. ¶ 20 & Ex. F, Detailed L/C Spreadsheet, ECF No. 12-8. Plaintiffs pointed the Court to evidence that Litton assessed Plaintiffs late fees on eight other occasions during 2004, 2005, and 2006. 2010 Composite Report at 9, 4/30/2007 entries. That same evidence suggests that Litton waived all of those late fees after Plaintiffs disputed them. *Id.* Nonetheless, there is also evidence that the late fees were *not* waived: in a letter from Litton to Plaintiffs dated November 13, 2009, Litton stated that Plaintiffs' loan had a "late fee balance of $214.73" because some of Plaintiffs' payments were "not received on or before the sixteenth

day of each month."  Spradling Aff. Ex. E at Litton000312-000313, Letter from Litton to Pls., Nov. 13, 2009, ECF No. 12-7 at 25-26.

## IV.  Plaintiffs' Correspondence With Litton

Throughout the life of Plaintiffs' loan, Plaintiffs and Litton corresponded regularly regarding the status of Plaintiffs' loan. *See generally* 2010 Composite Report.  Primarily, Plaintiffs asked Litton representatives why Litton considered their account to be past due, and Litton representatives either spoke with Plaintiffs or sent them letters regarding the account issues.  *E.g. id.* at 24, 5/8/2001 entries; *id.* at 20, 6/16/2003, 7/29/2003 & 8/9/2003 entries; *id.* at 19, 1/6/2004 entry; *id.* at 15, 7/8/2005 entry; Spradling Aff. Ex. E at Litton000293, Letter from Litton to Pls., Sept. 17, 2003, ECF No. 12-7 at 19 (explaining that audit revealed that one payment had been misapplied and that Plaintiffs had missed two payments); Spradling Aff. Ex. E at Litton000310, Letter from Litton to Pls., Nov. 7, 2003, ECF No. 12-7 at 24 (stating that mortgage is due for four payments); Spradling Aff. Ex. E at Litton000214, Letter from Litton to Pls., Jan. 6, 2004, ECF No. 12-7 at 2 (advising Plaintiffs that "all payments have been located and accounted for"); Spradling Aff. Ex. E at Litton000226, Letter from Litton to Pls., July 11, 2005, ECF No. 12-7 at 14 (advising Plaintiffs that loan is past due, has late charge balance of $170.06, and has corporate advance balance of $1,318.95); Spradling Aff. Ex. E at Litton000315, Letter from Litton

6

to Pls., Dec. 9, 2005, ECF No. 12-7 at 28 (explaining that loan is a "Daily Simple Interest loan"); Spradling Aff. Ex. E at Litton000224, Letter from Litton to Pls., May 12, 2006, ECF No. 12-7 at 12 (advising Plaintiffs that loan is past due, has late charge balance of $287.57, and has corporate advance balance of $1,318.95).

## A.  Correspondence Between July 27, 2009 and August 24, 2009

For purposes of their RESPA claims in this action, Plaintiffs focus on their correspondence with Litton dated on or after July 27, 2009.  Compl. ¶¶ 22-36, ECF No. 1.  Plaintiffs wrote to Litton on July 27, 2009, informing Litton that they believed they had paid their loan in full.  James Aff. Ex. 3, Letter from Pls. to Litton, July 27, 2009, ECF No. 16-4.  Plaintiffs also stated that they believed that the main problem with their loan "happened in the early years," and they requested "a complete account history of all payments made on [their] loan from the beginning of [the] loan to the present date."  *Id.*  Plaintiffs wrote to Litton again on August 4, 2009, stating that they received "a print out from May 2005," but that they wanted a complete account history, going back to the beginning of their loan in 1997.  James Aff. Ex. 4, Letter from Pls. to Litton, Aug. 4, 2009, ECF No. 16-5.  Litton acknowledged Plaintiffs' "recent inquiry" on August 5, 2009.  Spradling Aff. Ex. E at Litton000249, Letter from Litton to Pls., Aug. 5, 2009, ECF No. 12-7 at 15.  Plaintiffs again wrote to Litton on August 12, 2009,

requesting a "complete account history of [their] loan FROM THE BEGINNING DATE OF [their] LOAN IN 1997." James Aff. Ex. 5, Letter from Pls. to Litton, Aug. 12, 2009, ECF No. 16-6. In that letter, Plaintiffs referenced a letter they received from Litton threatening foreclosure. *Id.* Plaintiffs stated that Litton's letters and phone calls were making them "extremely emotionally upset" because they knew they were not delinquent on their loans. *Id.*

On August 19, 2009, Litton sent Plaintiffs a letter and enclosed a copy of the Note, as well as a Detail Transaction History going back to 1997. Spadling Aff. Ex. E at Litton000251, Letter from Litton to Pls., Aug. 19, 2009, ECF No. 12-7 at 17 (letter only) [hereinafter Aug. 19 Resp.]; *accord* Compl. Ex. 7, Letter from Litton to Pls., Aug. 19, 2009, ECF No. 1-2 at 14-35 (letter and enclosures).[1] In that letter, Litton stated that Plaintiffs' loan "is a Daily Simple Interest loan." Aug. 19 Resp. Litton also stated: "The amount of interest that is owed depends on the exact date the installments are received. The number of days between the payments determines the amount of interest owed. The interest on the loan accrues daily. Payments are applied first to accrued unpaid interest, then to principal." *Id.* Litton also stated that

_____

[1] For some reason, Litton did not point the Court to a copy of the August 19 Response that included the attachments. The Court presumes that Exhibit 7 to the Complaint is an accurate copy of the letter and its enclosures.

Plaintiffs could contact Litton's "Default Counseling Department" with questions. *Id.*

### B.  Plaintiffs' August 25, 2009 Letter

On August 25, 2009, Plaintiffs again wrote to Litton, outlining the specific flaws Plaintiffs perceived in the servicing of their account.  Aug. 25 Request.  Plaintiffs enclosed a number of documents, including their August 14, 2009 billing statement, the Detail Transaction History they received from Litton, and an amortization schedule.  The amortization schedule, which Plaintiffs relied on heavily in their letter, appears to have been created via a computer software program on June 3, 2009; it does not appear to be an amortization schedule Plaintiffs received from Litton.  *See generally* Aug. 25 Request Attach. 3, Amortization Schedule, ECF No. 16-7 at 26-29.  The amortization schedule presented by Plaintiffs assumes only 131 payments, while the Note contemplated 144 payments. Furthermore, based on the payment amount, the number of payments, and the schedule for principal and interest payments, it appears that the amortization schedule presented by Plaintiffs does not reflect Plaintiffs' actual interest rate of 14.639%.  Rather, according to the Court's calculations, the interest rate assumed in the amortization schedule presented by Plaintiffs is closer to 13.75%. Therefore, Plaintiffs' reliance on the amortization schedule is misplaced.

In the letter, Plaintiffs disputed Litton's assessment that Plaintiffs owed $8,015.95 in principal plus fees of $1,318.95 *Id.* at 1. To explain their dispute, Plaintiffs pointed to a number of examples. First, Plaintiffs pointed out that none of their first payment in July 1997 went to principal; all of it went to interest. *Id.*[2] Second, Plaintiffs pointed out that, of their next payment, made in September 1997, only $59.33 went to principal, though the next September 1997 payment appeared to be handled correctly. *Id.*[3] Plaintiffs continued with their analysis, pointing out that $48.54 was posted to principal in November 1997, $5.17 was posted to principal in January 1998, and that "nothing—not even a dime—was posted to principal" in February, March, or April 2008. *Id.* Plaintiffs noted that, "throughout the transaction history," as compared to the amortization schedule they presented, "too little" was credited to principal "and too much credited as interest." *Id.* Plaintiffs also noted that the principal balance reflected in various

---

[2]The simple explanation is that, according to Litton's records, Plaintiffs made their first payment seven days late. Based on the Court's calculations, Plaintiffs' payment was not enough to cover the interest that had accrued as of the payment date, which is likely why none of the payment was applied to principal. Litton, however, did not specifically respond to this point in Plaintiffs' letter.

[3]Again, the simple explanation is that, according to Litton's records, Plaintiffs' second payment was nine days late. Based on the Court's calculations, Plaintiffs' payment was not enough to cover the interest that had accrued as of the payment date, but NationsCredit inexplicably applied some of the payment to principal, anyway. Litton did not specifically respond to this point in Plaintiff's letter.

billing statements was greater than the projected principal balance in the incorrect amortization schedule. *Id.* at 2.

Plaintiffs further pointed out that they were charged $1,024.77 in "corp ad" fees, though they had not received an explanation for such fees and they believed that those fees were illegally charged. *Id.* Plaintiffs also asked Litton to explain why Litton was charging them fees in the amount of $1,318.95. *Id.* at 3. Finally, Plaintiffs stated that they had been "worried sick" over Litton's threats of foreclosure. *Id.*

### C. Litton's Responses to the August 25, 2009 Letter

Litton acknowledged Plaintiffs' August 25, 2009 letter on August 31, 2009. Spradling Aff. Ex. E at Litton000292, Letter from Litton to Pls., Aug. 31, 2009, ECF No. 12-7 at 18. On September 19, 2009, Litton sent Plaintiffs a letter responding to the August 25 letter, which Litton received on August 28, 2008. Spradling Aff. Ex. E at Litton000294, Letter from Litton to Pls., Sept. 19, 2009, ECF No. 12-7 at 20 [hereinafter Sept. 19 Resp.]. Litton explained that Plaintiffs' loan "is a daily simple interest loan." *Id.* Litton further explained that, with a daily simple interest loan, "[i]nterest is accrued immediately following receipt of the last payment and is set up on a thirty-day cycle. Payments must be received every thirty days to avoid additional interest from accruing. Monies received first satisfy interest owed and any

11

remaining funds are applied towards the principal balance." *Id.*
Litton did not address Plaintiffs' misplaced reliance on the
incorrect amortization schedule, and Litton did not respond to the
specific perceived problems Plaintiffs raised in their letter.

Litton also stated that Plaintiffs' loan "currently reflects []
fees of $1,329.45" and that "a pending fee of $125.00 exists." *Id.*
According to the letter, Litton enclosed a Composite Report and told
Plaintiffs that the Report detailed the fees assessed and paid on the
loan.[4]  The Composite Report does detail various fees, including a
number of fees that were assessed while Plaintiffs were in bankruptcy
between October 1998 and May 2003.  Compl. Ex. 11 at 2, Composite
Report, Sept. 19, 2009, ECF No. 1-2 at 92 [hereinafter 2009 Composite
Report].  For example, Litton assessed Plaintiffs a "BPO Fee" on four
occasions, with a pending fifth "BPO Fee." *Id.*  Likewise, Litton
assessed Plaintiffs "Bankruptcy Cost" on three occasions and a
"Bankruptcy Attorney Fee" on one occasion. *Id.*  Litton also assessed
"Inspection Fees" on seven occasions, "LSAM Recoveries" on two
occasions, and one "Property Services Insp. - Drive By In" fee.
Nothing in the Composite Report or September 19 letter explains what
these fees are for or why Litton assessed them.  Furthermore,

---

[4]Though Litton inexplicably failed to provide the Court with a copy
of the Composite Report along with its copy of the September 19 letter, the
Court presumes that it is the same Composite Report that Plaintiffs
included in Exhibit 11 to the Complaint.  Compl. Ex. 11 at 2, Composite
Report, Sept. 19, 2009, ECF No. 1-2 at 92.

although, according to the letter, Litton enclosed a copy of Plaintiffs' Detail Transaction History and represented that the "history documents . . . fees assessed," only one of the fees listed on the Composite Report even appears to be reported on the Detail Transaction History.[5] *Compare* 2009 Composite Report (listing "LSAM Recoveries" fee of $159.68 on December 3, 2003), *with* Txn. History at 14 of 49 (listing "CORP ADVANCE ADJUST" in the amount of $159.68 on December 2, 2003).

Finally, Litton told Plaintiffs in the September 19 letter that they could contact Litton's "Default Counseling Department" with questions. Sept. 19 Resp.

D. Plaintiffs' October 6, 2009 Letter

Plaintiffs wrote to Litton again on October 6, 2009. James Aff. Ex. 8, Letter from Pls. to Litton, Oct. 6, 2009, ECF No. 16-9. Plaintiffs told Litton that the September 19, 2009 letter was not a proper response to the August 25 letter. *Id.* Plaintiffs reiterated that they were "VERY UPSET" about Litton's collection calls and letters. *Id.*

---

[5]Again, Litton failed to attach a copy of the Detail Transaction Report to the copy of the September 19 letter that Litton provided to the Court. The Court presumes that it is the same as the Detail Transaction History that Plaintiff Ward James attached to his affidavit, except with additional transactions beyond June 2009. *See* Txn. History.

Litton acknowledged Plaintiffs' October 6, 2009 letter on October 14, 2009.  Spradling Aff. Ex. E at Litton000309, Letter from Litton to Pls., Oct. 14, 2009, ECF No. 12-7 at 23.  On November 13, 2009, Litton sent Plaintiffs another letter.  Spradling Aff. Ex. E at Litton000312-000313, Letter from Litton to Pls., Nov. 13, 2009, ECF No. 12-7 at 25-26 [hereinafter Nov. 13 Resp.].  In that letter, Litton briefly discussed Plaintiffs' bankruptcy proceeding and confirmed that Litton received the pre-petition arrearages it claimed in Plaintiffs' bankruptcy proceeding.  *Id.* at Litton000312.  Litton also explained that "there is an outstanding corporate advance balance of $1,464.95.  This consists of the following: $81.00 of inspection fees, $525.00 of broker price opinion fees, and $858.95 bankruptcy fees and costs."  *Id.*  Litton acknowledged that "$475.00 of the $858.95 were awarded and paid by the Chapter 13 Trustee . . . per the July 10, 2001 Consent Order."  *Id.*  Litton also stated that it would remove the $858.95 bankruptcy fees and costs from Plaintiffs' loan.  *Id.*

Litton did not, however, remove the remaining $606.00 in fees, which were "inspection fees and broker price opinion fees."  *Id.*  Although Litton's letter states that these charges "are recoverable from [Plaintiffs] per the terms of [their] Deed to Secure Debt," the letter does not explain precisely what the fees are for or why Litton

14

assessed them. *Id.* The letter does state that, "if the loan is in default, the mortgage servicer is permitted to order property inspections" and "Competitive Market Analyses" conducted by a "mortgage broker." *Id.* at Litton000313. The letter further provides that the "mortgagor is responsible for the reimbursement of these expenses." *Id.* Litton's letter does not explain why Litton considered Plaintiffs' loan to be in default or why Litton assessed multiple inspection fees within a short time period. *See* 2009 Composite Report (assessing inspection fees on February 20, 2003, February 21, 2003, April 6, 2003, August 14, 2003, October 7, 2003, October 26, 2003, and December 2, 2003). Litton's November 13, 2009 letter also does not elucidate what an "LSAM Recovery" fee is. *See generally* Nov. 13 Resp.

Litton's November 13 letter also informed Plaintiffs that their loan had "a late fee balance of $214.73." Nov. 13 Resp. at Litton000313. Finally, Litton stated that Plaintiffs could contact Litton's "Default Counseling Department" with questions. *Id.*

### F.   Plaintiffs' November 13, 2009 Letter

On November 13, 2009, Plaintiffs wrote to Litton again, asserting that Litton had never explained why Plaintiffs' payments were, in Plaintiffs' view, improperly applied. James Aff. Ex. 10, Letter from Pls. to Litton, Nov. 13, 2009, ECF No. 16-11. Plaintiffs

15

demanded that Litton return "the excess interest and fees" that Litton had collected from Plaintiffs. *Id.*

### G. Plaintiffs' Reaction to Their Correspondence With Litton

Based on the correspondence they received from Litton, including multiple letters threatening foreclosure, Plaintiffs "live in constant fear of losing [their] home through foreclosure." James Aff. ¶ 27. Plaintiffs also represent that Litton's actions caused them "tremendous stress" and "tremendous emotional suffering" and that Mrs. James's high blood pressure and diabetes have been exacerbated as a result of the stress. *Id.* ¶¶ 28-29. In addition, Mrs. James "frequently has uncontrollable crying spells," and Plaintiffs "often have trouble sleeping." *Id.* ¶ 30.

DISCUSSION

## I. RESPA Claim

### A. RESPA Basics

Congress enacted RESPA to ensure that consumers "are provided with greater and more timely information on the nature and costs of [real estate] settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices." Real Estate Settlement Procedures Act of 1974, Pub. L. No. 93-533, 88 Stat. 1724. RESPA is a consumer protection statute, and it "is to be 'construed liberally in order to best serve Congress' intent.'" *McClean v. GMAC Mortg. Corp.*, No. 09-11054, 2010 WL 3784527, at *3

(11th Cir. Sept. 30, 2010) (quoting *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 707 (11th Cir. 1998)). Plaintiffs contend that Litton violated the RESPA provisions that require a loan servicer to respond to borrower inquiries. Under RESPA, a "servicer of a federally related mortgage loan" that receives a "qualified written request" from a borrower for information relating to the servicing of the loan must (1) acknowledge receipt of the request within twenty business days and (2) take any necessary action within sixty business days. 12 U.S.C. § 2605(e).

A "qualified written request" must enable the loan servicer to identify "the name and account of the borrower" and must include "a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B). In response to a qualified written request, the loan servicer must "make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction." 12 U.S.C. § 2605(e)(2)(A). The servicer must also conduct an investigation and provide the borrower with a written explanation or clarification that includes, "to the extent applicable, a statement of the reasons for which the

servicer believes the account of the borrower is correct as determined by the servicer." 12 U.S.C. § 2605(e)(2)(B)(i).

If a servicer fails to comply with RESPA, the borrower may recover "any actual damages to the borrower as a result of the failure." 12 U.S.C. § 2605(f)(1)(A). RESPA does not define "actual damages." Though there is no published Eleventh Circuit Court of Appeals case on point, the Eleventh Circuit recently found that, "based on the interpretations of 'actual damages' in other consumer-protection statutes that are remedial in nature, plaintiffs arguably may recover for non-pecuniary damages, such as emotional distress and pain and suffering, under RESPA." *McClean*, 2010 WL 3784527, at *3. To recover for emotional distress, a RESPA plaintiff must have "suffered demonstrable emotional distress, which must be sufficiently articulated." *Id.*

B. Plaintiffs' RESPA Requests and Litton's Responses

Plaintiffs cannot seriously dispute that Litton timely responded to Plaintiffs' July 27, 2009, August 4, 2009, and August 12, 2009 requests for a complete account history. Litton provided the complete account history to Plaintiffs on August 19, 2009. Aug. 19 Resp. (letter only); *accord* Compl. Ex. 7, Letter from Litton to Pls., Aug. 19, 2009, ECF No. 1-2 at 14-35 (letter and enclosures). Therefore, the key issue in this case is whether Litton adequately responded to Plaintiffs' August 25, 2009 letter. Litton does not

18

dispute that the August 25, 2009 letter was a qualified written request. Litton did provide a timely response to Plaintiffs' August 25, 2009 letter because both the September 19, 2009 Response and the November 13, 2009 Response were sent within sixty business days of Litton's receipt of the August 25, 2009 request. The Court finds, however, that a genuine fact dispute exists as to whether Litton's responses were adequate under RESPA.

In their summary judgment motion, Litton asserts that "Plaintiffs have failed to put forth any evidence in support of their RESPA claim against Litton." Def.'s Mot. for Summ. J. 14; *see also id.* at 16. Litton appears to misunderstand its summary judgment burden. Litton, the party moving for summary judgment, has the burden to show that there is no genuine fact dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden is met, the burden shifts and the nonmoving party must produce evidence to show that there is a genuine fact dispute. *Id.* at 324. Thus, Plaintiffs had no burden to present evidence *prior* to Litton's summary judgment motion. In response to Litton's summary judgment motion, Plaintiffs pointed the Court to the correspondence between Litton and Plaintiffs, which demonstrates a genuine fact dispute as to whether Litton's responses satisfied the requirements of RESPA. Litton did not reply to Plaintiffs' response.

Litton argues that it "did everything in its power to let Plaintiffs know exactly how their payments were being applied and why certain charges had been incurred." Def.'s Mot. for Summ. J. 16. Fortunately for Litton, such dramatic measures are not required by RESPA, and they certainly were not taken here. Rather, Litton's correspondence to Plaintiffs was vague and confusing, it failed to answer all of Plaintiffs' specific questions, and it was inconsistent with other correspondence between Plaintiffs and Litton.

In the August 25, 2009 letter, Plaintiffs raised two main issues. First, Plaintiffs pointed out that, based on their calculations and the amortization table they found, their payments were not properly credited to principal and interest. Aug. 25 Request at 1-2. Second, Plaintiffs asked Litton to explain why Plaintiffs were charged certain fees. *Id.* at 2-3. The Court addresses Litton's responses to each issue in turn.

In their August 25, 2009 letter, Plaintiffs generally complained that Litton had not properly credited their payments to principal and interest. In its September 19, 2009 response, Litton told Plaintiffs—as they had on multiple previous occasions—that their loan is a "daily simple interest loan" and that payments are applied first to unpaid interest, then to principal. This message had obviously not resonated with Plaintiffs on any prior occasion. It is mystifying to imagine how Litton's employees could think that simply

20

repeating the message again would be effective. Nonetheless, the explanation might be considered reasonable if Plaintiffs had only made a general allegation that their payments were not properly allocated between principal and interest. Plaintiffs, however, also provided a handful of specific examples of instances when their payments were not, in Plaintiffs' view, properly credited.

As discussed above, Litton had an obligation to provide Plaintiffs with "a statement of the reasons for which [Litton] believes [Plaintiffs' account] is correct as determined by [Litton]." 12 U.S.C. § 2605(e)(2)(B)(i). It is therefore not unreasonable to expect that Litton would respond to at least a few of Plaintiffs' specific examples, particularly where, as here, there seems to be such a simple explanation. For example, with regard to the first payment of $591.80, the simple explanation as to why the entire payment was applied to interest is likely that NationsCredit did not receive the payment from Plaintiffs until seven days after the due date. *See* Txn. History at 24 of 49. Based on Plaintiffs' interest rate and outstanding principal balance, Plaintiffs owed more than $100 extra in interest with that first payment, and their regular payment of $591.80 was not enough to cover that extra interest plus the interest due as of their regular due date. That is likely why NationsCredit did not credit any of the payment to principal. As to the second payment, which Litton's records show was received

21

approximately nine days late, *id.*, the same explanation likely applies, although it is unclear why NationsCredit would apply even $59.33 of Plaintiffs' payment to principal given the amount of accrued unpaid interest as of the date. Furthermore, it is obvious that the amortization table presented by Plaintiffs with their August 25, 2009 letter did not apply to Plaintiffs' loan and thus, did not accurately state what amount of each payment should be applied to interest and principal, so that is a simple explanation why "too little" was credited to principal and "too much" was credited to interest as compared to the amortization table. Finally, though Plaintiffs asserted in their August 25 letter that "not even a dime" was credited to principal in February, March, or April of 2008, a simple response to this alleged error is that Litton's records reflect that Litton credited more than $1200 to principal during those three months. Txn. History at 8 of 49.

Even if there were no dispute that Litton's responses sufficiently addressed Plaintiffs' specific concerns regarding how the principal and interest were applied to their loan, there is a dispute as to whether Litton's responses adequately addressed Plaintiffs' concerns regarding the fees. Plaintiffs asked why Litton charged the fees. Aug. 25 Request at 3. In response, Litton first sent Plaintiffs a Composite Report and Detail Transaction History and told Plaintiffs that those documents detailed the fees. Sept. 19

22

Resp.  As discussed above, the Composite Report did detail various fees, but nothing in the Composite Report, Detail Transaction History, or the September 19 letter explained what these fees were for or why Litton assessed them.  Thus, a reasonable factfinder could conclude that the September 19 letter did not provide "a statement of the reasons for which [Litton] believes [Plaintiffs' account] is correct as determined by [Litton]," with regard to the fees.

Likewise, a reasonable factfinder could conclude that Litton's November 13 response did not provide an adequate response to Plaintiffs' request for clarification regarding the fees.  As discussed above, though Litton did remove the bankruptcy fees, Litton did not explain the "LSAM Recovery" fee at all, nor did Litton explain why it considered Plaintiffs' loan to be in default when it assessed many of the fees that were based on Plaintiffs' alleged default status, or why Litton assessed multiple inspection fees within a short time period.  Finally, the November 13 response interjected additional confusion regarding late fees; although the Note does not provide for late fees and Litton had previously told Plaintiffs that they did not owe such fees, Litton's November 13 response stated that Plaintiffs owed $214.73 in late fees.  Nov. 13 Resp. at 2.  For all of these reasons, the Court finds that there is a genuine fact dispute as to whether Litton's September 19, 2009 and November 13, 2009 correspondence satisfied the requirements of RESPA.

23

Litton contends that, even if its responses did not satisfy the requirements of RESPA, "there is <u>no</u> evidence that Plaintiffs suffered any harm as a result of Litton's alleged RESPA violation." Def.'s Mot. for Summ. J. 16. As discussed above, Plaintiffs may recover for "non-pecuniary damages, such as emotional distress and pain and suffering." *McClean*, 2010 WL 3784527, at *3. Plaintiffs presented unrebutted evidence that Litton's actions caused them "tremendous stress" and "tremendous emotional suffering" and that Mrs. James's high blood pressure and diabetes have been exacerbated as a result of the stress. James Aff. ¶¶ 28-29. In addition, Mrs. James "frequently has uncontrollable crying spells," and Plaintiffs "often have trouble sleeping." *Id.* ¶ 30. From this, the Court concludes that a genuine fact dispute exists as to whether Plaintiffs suffered actual damages as a result of Litton's alleged RESPA violations. Litton's summary judgment motion as to the RESPA claims is therefore denied.

## II.  Breach of Contract Claim

Litton contends that it cannot be held liable under a breach of contract theory because Plaintiffs had a contract with NationsCredit, not with Litton. Def.'s Mot. for Summ J. 17. Plaintiffs alleged that Litton "took over servicing" of their loan. Compl. ¶ 10. Plaintiffs did not, however, allege that they had a contract with Litton, nor did they point to any evidence of such contract. As a

24

loan servicer, Litton is not a party to or an assignee of the Note itself. In the absence of evidence of a contract between Plaintiffs and Litton, Plaintiffs' breach of contract claim fails. *E.g.*, *Shugart v. Ocwen Loan Servicing, LLC*, Case No. 2:09-cv-1123, 2010 WL 3894155, at *2 (S.D. Ohio Sept. 28, 2010). Plaintiffs point the Court to no authority holding otherwise.

Plaintiffs point out that a loan servicer "is a real party in interest with standing to conduct . . . the legal affairs of the investor relating to the debt it services." *Greer v. O'Dell*, 305 F.3d 1297, 1299 (11th Cir. 2002). In *Greer*, the loan servicer had purchased certain accounts from the original lender and had agreed to provide legal services for the lender until the accounts were officially transferred to the loan servicer. *Id.* The fact that a loan servicer, which has undertaken a contractual obligation to provide legal services for a lender, may appear in bankruptcy court to protect a claim relating to the debt it services does not mean that the servicer is considered in privity with a borrower for purposes of a breach of contract claim. Plaintiffs do not argue or present evidence on any viable alternative theory under which Litton could be held liable for breach of contract.

For all of these reasons, Litton is entitled to summary judgment on Plaintiffs' breach of contract claims.

### III. Fraud and Conversion Claims

To state a claim for fraud under Georgia law, Plaintiffs must establish: "(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." *Wolf v. Middleton*, 305 Ga. App. 784, 788, 700 S.E.2d 598, 602 (2010). Under Georgia law, conversion "consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." *E.g., Adler v. Hertling*, 215 Ga. App. 769, 773, 451 S.E.2d 91, 96 (1994) (internal quotation marks omitted). "To make out a prima face case of conversion, a plaintiff must show that she has title to the property, that the defendant wrongfully possessed it, and that she demanded possession but the defendant refused to surrender it." *Dierkes v. Crawford Orthodontic Care, P.C.*, 284 Ga. App. 96, 98, 643 S.E.2d 364, 367 (2007).

Litton argues that Plaintiffs "failed to demonstrate any intent to deceive on the part of Litton" and, therefore, Plaintiffs cannot establish a fraud claim. Def.'s Mot. for Summ. J. 19. Litton also argues that Plaintiffs cannot establish a conversion claim because Litton was legally entitled to receive payments on the loan. *Id.* at

22. Litton further asserts that Plaintiffs did not have an absolute and unconditional right to ownership of the funds received by Litton because, according to Litton's own internal audit, Litton applied the funds correctly. *Id.*

A reasonable factfinder could conclude, however, that Litton did *not* apply the funds correctly because it intentionally delayed processing Plaintiffs' payments, thereby increasing the amount of interest due. There is also evidence that Litton intentionally charged Plaintiffs late fees which, under the Note, Litton had no authorization to charge. Finally, there is evidence that Litton did not properly credit Plaintiffs' account when Plaintiffs demanded that Litton do so. The end result: (1) a percentage of Plaintiffs' payments were improperly applied to interest instead of principal, (2) Plaintiffs' outstanding principal balance was not reduced as quickly as it should have been, and (3) Plaintiffs had an outstanding late charge balance, which also affected how quickly their principal balance could be paid down. The Court therefore concludes that genuine fact disputes exist as to whether: (1) Litton intentionally misrepresented the outstanding principal and late fees due in Plaintiffs' monthly statements, (2) Litton intentionally did not apply enough of Plaintiffs' payments to principal because it applied them to extra interest and unauthorized late charges, and (3) Plaintiffs continued to make payments based on Litton's

misrepresentations.  Summary judgment is therefore inappropriate on Plaintiff's fraud claim.

Litton also appears to contend that Plaintiffs' conversion claim cannot succeed because the money converted was not specifically identifiable funds.  Def.'s Mot. for Summ. J. 21-22.  It is not clear from the present record exactly what Plaintiffs' loan balance should have been as of late 2009 had Litton applied Plaintiffs' payments correctly, but the funds that Litton allegedly converted can be identified as the difference (if any) between the amount Plaintiffs actually owed on the loan and the amount Litton claimed that Plaintiffs owed on the loan.  For all of these reasons, Litton is not entitled to summary judgment on Plaintiffs' conversion claim.  *C.f. Johnson v. Citimortgage, Inc.*, 351 F. Supp. 2d 1368, 1372 (N.D. Ga. 2004) (denying motion to dismiss Georgia law conversion claim where borrower alleged that servicer failed to apply certain funds to his account despite repeated demands that servicer do so).

## IV.  Negligence Claim

The Court has reviewed Litton's summary judgment motion on the negligence claim and finds that genuine issues of material fact exist as to that claim.  Summary judgment is therefore inappropriate.

### CONCLUSION

For the reasons set forth above, Litton's Motion for Summary Judgment (ECF No. 12) is denied as to Plaintiffs' RESPA, fraud,

conversion, and negligence claims.  Litton's motion is granted as to Plaintiffs' breach of contract claim.

IT IS SO ORDERED, this 4th day of January, 2011.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE